UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:23-cr-80183-KAM

UNITED STATES OF AMERICA

v.

ROGELIO GARCIA,

    Defendant.
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

**I.     Introduction**

The government files this response to the defendant Rogelio Garcia's (GARCIA) Objections to the Presentence Investigation Report (PSR) in docket entry 62. The defendant makes four objections. The defendant objects to specific offense characteristics assessed for the number of aliens smuggled or harbored [PSR ¶ 36] and the possession of a firearm [PSR ¶ 37] as well as an adjustment for obstruction of justice. [PSR ¶ 41]. He also objects to the denial of a downward adjustment for acceptance of responsibility. [PSR ¶ 44]. The government's position is that all of the defendant's objections should be overruled except for the firearm enhancement. The government agrees that the firearm enhancement should not apply. The government is, however, seeking the enhancement for six or more aliens, the two enhancements for obstruction of justice, and agrees with the denial of acceptance of responsibility.

## II. Facts

The government agrees with the facts stated in the PSR. However, the government is also presenting a more detailed summary of the case below in the event it needs to present this evidence at the sentencing hearing:

### May 4, 2023

On May 4, 2023, at approximately 7:18 a.m., Boca Raton Police Department (BRPD) responded to the Waterstone Resort & Marina at 999 E. Camino Real, Boca Raton, FL about a possible migrant vessel dropping off migrants. An employee of the resort stated that a Hispanic male was making several trips on a blue jet-ski transferring people to the dock.

A BRPD Marine Officer in his marked police vessel entered the Lake Boca Raton area from the north and noticed a white cabin cruiser (later identified as having the name "Boss-Sea") pulled into a slip behind a residence located at S. Ocean Blvd., Boca Raton, Florida. Based on his routine patrol of the area, he knew the vessel did not belong to the residence. As the BRPD Marine Officer approached the vessel, there were no persons in plain view on the vessel, and two jet-skis were tied to the stern, and one of them was blue (matching the report from the hotel). As he tied a line to the vessel, a man later identified as Rogelio GARCIA exited the cabin. The BRPD Marine Officer asked GARCIA if there were any other persons onboard. GARCIA said yes, his deck hands, later identified as Pedro Antonio PEREZ and Walter Serrano-Cabrera. GARCIA, PEREZ, and Serrano were separated.

The BRPD Marine Officer asked GARCIA for his vessel documentation. When GARCIA was asked where he was coming from, he responded with words to the effect of "here." When asked where here is, GARCIA responded with "Miami", then said "The River." GARCIA stated the vessel had engine issues and his anchor began dragging him east to the dock. GARCIA said that while he was waiting for Towboat USA, he transported six individuals from his vessel to the Waterstone Hotel via jet-ski.

At approximately 8:00 a.m., Department of Homeland Security, Customs and Border Protection, Air and Marine Operations arrived on scene. Marine Interdiction Agent (MIA) Kyle Eicher boarded the vessel. MIA Eicher was advised by BRPD of a firearm on the bridge of the vessel. MIA Eicher went to the bridge and secured the firearm. While on the bridge, MIA Eicher noticed a small money safe and a backpack next the helm.

MIA Eicher was told by a Coast Guard boarding officer that the owner of the boat, G.W., was on the telephone. MIA Eicher spoke to G.W. on the phone. G.W. advised that

2

GARCIA was supposed to take the vessel on a charter to Bimini, Bahamas on Monday, May 1, 2023, and was to return on Wednesday night (May 3, 2023). G.W. appeared surprised and upset by the fact that his boat was suspected of being used for migrant smuggling and that it had not yet been returned.

MIA Eicher spoke with GARCIA and asked him to explain the trip. GARCIA said he completed a charter late Sunday (April 30). GARCIA said that on Monday (May 1), he picked up some friends and partied until the boat broke down near Boca Inlet late Wednesday night (May 3). GARCIA said he called a friend to help and that the friend brought two jet-skis to tow the boat. GARCIA said that at some point Towboat USA arrived and towed them the rest of the way. MIA Eicher asked GARCIA where they went from Monday until the boat broke down. GARCIA stated they spent some time inshore at Miami, offshore to fish, and then they drove up and down the coast. MIA Eicher asked GARCIA to whom did the safe and backpack on the bridge belong. GARCIA stated they belonged to him. GARCIA consented to a search of the safe and backpack. GARCIA opened the safe. The safe contained a plastic bag stowing eight bundles of United States Currency wrapped in rubber bands. The backpack contained another plastic bag with a large bundle of United States currency. GARCIA claimed the money came from an inheritance. The combined amount was approximately $53,700.00 USD.

While still on scene on the vessel, Homeland Security Investigations (HSI) Special Agent (SA) Elvis Medina and MIA Jason Miele interviewed Pedro Antonio PEREZ about the events surrounding the current charter. PEREZ was read his Miranda rights and PEREZ agreed to speak with law enforcement. PEREZ said that it was a two or three day fishing trip. There were approximately nine people on board (three women, six men) in addition to himself and GARCIA. PEREZ said that they picked up the passengers on Tuesday afternoon (May 2). PEREZ said that he personally loaded all passengers in Miami, FL and he did not know the passenger's nationalities. PEREZ said that a few of the passengers spoke broken English. PEREZ said that that Serrano-Cabrera had family members on board. PEREZ said they fished beyond twenty nautical miles offshore on Tuesday afternoon. He said that on Wednesday evening their primary engine ran out of gas. He switched fuel lines, but it only lasted 20 minutes. PEREZ estimated they were between Boca Raton, FL and Lauderdale, FL when they ran out of gas. PEREZ said they called Tow Boat USA, but by the time Towboat USA reached them they had drifted north. He said that Tow Boat USA towed them to the Lake Boca Raton area and anchored around 1:00 or 2:00 a.m., which caused the guests to be upset. PEREZ said they advised the guests they will have to wait until the morning to refuel before they could head back south again. GARCIA said that at the crack of dawn, the passengers requested they be taken ashore. PEREZ said the captain (Rogelio GARCIA) ferried them to the resort via the jet-ski, which belonged to PEREZ's friend "Chris." PEREZ said that he as seen the safe on the boat but that he did not know anything about the safe. He denied having seen a gun on the boat, but believed, "a gun should be on this boat in the hands of the captain." PEREZ stated he has never seen GARCIA with a gun. He believed that GARCIA can't own a weapon because he is a

convicted felon. PEREZ stated that he does not know if the boat went to the Bahamas. He said that they "did not go to land." PEREZ stated that he did not get off the boat.

A review of U.S. immigration records and databases revealed that SERRANO-Cabrera did not possess the legal documentation to lawfully enter or reside in the United States. SERRANO had an Ecuadorian identification document bearing his name and photograph.

On May 4, 2023, HSI Special Agents Elvis Medina and Aisha Rahman conducted a telephonic interview G.W., the owner of the Boss-Sea. G.W. said he hires GARCIA to captain charters. GARCIA captains his boat two to three times a month depending on bookings. G.W. said he did not book this charter, but GARCIA did. GARCIA told him that he was taking friends to a house in the Bahamas and deep-sea fishing. G.W. said there was no formal contract between him and GARCIA because GARCIA was a friend. G.W. said GARCIA agreed to pay $5,000 for the charter and that G.W. received $2,500 that morning (May 4). G.W. said that most charters cost about $5,000-$10,000. G.W. said that GARCIA left on Monday (May 1) and was supposed to return on Tuesday night or Wednesday morning (May 2 and May 3). On Wednesday morning he received a text from GARCIA stating everything was fine and they were hungover. G.W. stated he does not keep anything on the boat besides towels, personal supplies, and life jackets. He does not have any clothes or money on the boat. Agents advised G.W. that a large sum of cash was found by law enforcement officers on the boat. G.W. stated the money was not his. G.W. stated he does not keep any weapons on the boat and does not own a firearm. G.W. did not know if the captain owns a firearm. G.W. stated the boat's global positioning system does not work.

On May 4, 2023, HSI Special Agents Elvis Medina and Aisha Rahm conducted a telephonic interview of A.K., employee of Towboat USA. A.K. stated they received a call regarding the Boss-Sea around 8:15 p.m. on May 3. A.K. attempted to call the vessel but was unsuccessful. The boat was anchored approximately two miles offshore east of Delray Beach, Florida. He said there were three people on board the boat, and it seemed like they were intoxicated or "really spazzed out" and they were towing two jet-skis. He was told the boat ran out of fuel. A.K. stated he anchored them at the Northeast side of Lake Boca Raton around 2:30-3:00 a.m.

On May 4, 2023, HSI SA Alex Schmidt and HSI Task Force Officer (TFO) Anthony Vituccio conducted an interview of the Director of Food and Beverage at the Waterstone Resort & Marina. This person said he observed people disembark from a jet-ski at the hotel dock located at the rear of the building. He observed five people on the jet-ski at one time, not including the operator. He stated there were three trips made in total. He notified the jet-ski operator the dock was private, and they were not allowed to disembark at the hotel. He describes the jet-ski operator as bald with a salt and pepper beard. He stated he

4

asked the men who disembarked form the jet-ski where were they from, the men responded they were from Honduras.

HSI SA Schmidt and HSI TFO Vituccio were escorted to the dock in which the jet-ski disembarked passengers. While there, agents observed an abandoned backpack on the docks. Agents asked the aforementioned director of food and beverage if the backpack was part of the event, and he replied that it was.

SA Schmidt and TFO Vituccio conducted a search of the abandoned backpack and found a Chinese identification card with the name W.Z. HSI later discovered that the person two whom this identification document belonged later filed an asylum application with ICE using the same name and date of birth as on the ID. In that application, W.Z. claimed that he entered without inspection illegally on May 4, 2023 near Miami, which matches this smuggling event.

HSI SA Elvis Medina conducted a review of the Waterstone Resort & Marina security camera recordings. Waterstone Resort & Marina advised agents the times on the camera were incorrect. Waterstone Resort & Marina security camera #9 overlooks the outside dining area and part of the docks. At approximately 5:41 a.m., security camera number #9 shows a jet-ski departing the Waterstone Resort & Marina docks and two males walking from the dock area to the outside dining seating area. At approximately 5:50 a.m., security camera number #9 shows two additional males walking the outside dinning seating area. At approximately 6:05 a.m., security camera number 9 shows two additional males walking from the dock area and gathering with the males in the dining seating area. At approximately 6:08 a.m., security camera number #9 shows five males walking towards the back dock area of the Waterstone Resort & Marina. This area is out of the view of the Waterstone Resort & Marina security camera #9.

Waterstone Resort & Marina security camera #1 oversees the foyer between the restaurant and hotel lobby. At approximately 6:09 a.m., camera #1 shows seven males exiting the restaurant, crossing the foyer, and entering the hotel lobby area leaving wet footprints on the floor. At approximately 6:10 a.m., camera #1 shows a male exiting the restaurant, crossing the foyer, and entering the hotel lobby area. At approximately 6:12 a.m., camera #1 shows 3 additional males exiting the restaurant, running thru the foyer into the hotel lobby. The men observed crossing the foyer where the same men observed gathering at the outside dining/dock area.

Waterstone Resort & Marina security camera #5 oversees the parking lot. At approximately 6:11 a.m., camera #5 captured eight men running thru the parking lot, and into The Carlton condominiums parking lot area located at 901 East Camino Real, Boca Raton, FL 33432.

HSI SA Elvis Medina conducted a review of The Carlton condominiums security camera recordings. The Carlton condominiums have a security camera identified as "Dock", the camera overlooks the sidewalk that leads to the docks, and it captures part of Lake Boca Raton. At approximately 7:04 a.m., the dock camera shows a blue jet-ski with approximately four individuals heading east towards the Waterstone Resort & Marina Hotel. At approximately 7:07 a.m., the jet-ski and single operator is observed traveling west at a high rate of speed. At approximately 7:12 a.m., the dock camera captures the same jet-ski with multiple people on board traveling east towards the Waterstone Resort & Marina Hotel. At approximately 07:12 a.m., the jet-ski and single operator is observed traveling west at a high rate of speed. At approximately 7:15 a.m., the camera captures the same jet-ski with an unknown amount of people traveling east towards the Waterstone Resort & Marina Hotel. At approximately 7:16 a.m., the jet-ski and single operator is observed traveling west at a high rate of speed.

The Carlton condominiums have a security camera identified as "Parking S/E", the camera overlooks the condominiums entrance and the southeast parking lot. This parking lot borders the Waterstone Resort & Marina parking lot. At approximately 07:15 a.m., the parking S/E camera captures six males walking from the Waterstone Resort & Marina get into a white van. At approximately 7:18 a.m., the parking S/E camera captures a male exit the van and walk to the entrance of the condominium and run back. At approximately 7:20 a.m., the parking S/E camera captures the van exit the Carlton parking lot and head east on E Camino Real. The six males are the same individuals observed near the dock, running through the foyer, and running through the parking lot of the Waterstone Resort & Marina.

### June 18, 2023

On June 18, 2023, at approximately 3:30 p.m., the Palm Beach County Sheriff's Office (PBSO) coastal radar system detected a target of interest (TOI) about 17.2 nautical miles east of Singer Island, traveling westbound towards the United States. The radar system reacquired the TOI at about 5:05 p.m., showing the TOI about 8 miles offshore south of the Jupiter inlet. The PBSO Marine Unit launched a vessel to intercept the TOI. PBSO also notified the United States Coast Guard (USCG) of the TOI. PBSO and USCG were able to locate and stop the vessel at approximately 5:49 p.m., at about 1.7 miles offshore east of North Singer Island.

The PBSO Marine Unit and USCG conducted a joint intercept of the 23-foot red and white vessel. They observed a male with long brown hair driving the vessel. The driver (later identified as Rogelio GARCIA) immediately stopped the vessel. GARCIA stated they were fishing. USCG noticed there was no ice, bait, or catch on board, but there were fishing rods. USCG asked GARCIA how many people were on board the vessel, and GARCIA said there were five people on board. USCG identified the passengers as Pedro Antonio PEREZ, C.W. (a citizen and national of Haiti), P.C. (a citizen and national of Haiti), and L.D. (a citizen and national of Haiti). USCG MEI Richard D. Pridge heard

PEREZ tell GARCIA "I told you we should not have picked these guys up", and GARCIA told PEREZ "shut up."

At approximately 7:15 p.m., U.S. CBP Air and Marine Operations (AMO), arrived on scene. Based upon reasonable certainty that border crossing had transpired, AMO Marine Interdiction Agent (MIA) Joshua Williams began questioning the occupants regarding their voyage, cargo, and citizenship. GARCIA and PEREZ both stated they left Miami approximately two days prior. MIA Williams asked GARCIA where they were coming from, and GARCIA claimed to not understand the question. MIA Williams asked GARCIA where he last touched land and where did he get the other subjects, and GARCIA stated "Freeport." Freeport is the main city on Grand Bahama, an island in the northwest Bahamas.

AMO seized the suspect vessel, which displayed registration number FL7420GM. A search of the Florida Department of Highway and Motor Vehicles revealed that the vessel is a 1991 23' vessel. The vehicle was last titled and registered on June 6, 2023, and has a registration expiration date of November 16, 2023. The vessel is registered to a United States Citizen, with initials A.M.A., in Florida. The vessel was not reported stolen in NCIC/FCIC.

There were a total of five subjects onboard the suspect vessel. All subjects were transferred to a U.S. Coast Guard (USCG) cutter for biometric processing and analysis. Two of the subjects were determined to be United States Citizens (GARCIA and PEREZ), and the rest of the individuals were determined to be foreign nationals or not be in possession of any documentation authorizing them to enter the United States.

On July 19, 2023, a Regional Concurrence Team call was convened between the Department of Homeland Security partners, and it was determined that GARCIA and PEREZ would be brought ashore for further investigation by HSI. The remaining individuals that remained on the USCG cutter, all of whom were determined to be foreign nationals with no permission to enter the United States, were to be returned to the Bahamas by the USCG.

On June 19, 2023, GARCIA and PEREZ were transported to and first landed in the United States, at the USCG Lake Worth Inlet station, in Palm Beach County.

On June 20, 2023, HSI was informed that P.C. was brought ashore to receive medical attention. Once medically cleared, he was taken to the Dania Beach Border Patrol Station for administrative processing.

On June 20, 2023, at approximately 12:45 p.m., SA Medina and Border Patrol Agent (BPA) Michael V. Guerin conducted an interview of P.C. at the Dania Beach Border Patrol Station. P.C. was only fluent in the Creole language, so the agents utilized the assistance

of a Creole interpreter on the phone from Lionbridge translation services. P.C. was advised of his Miranda warnings in the Creole language. After being advised of his Miranda warnings, P.C. elected to continue speaking with the agents. P.C. stated he was born in Haiti and has never applied for a visa to enter the United States. P.C. stated he left Haiti on Thursday (06/15/2023) from Port de Paix, Haiti. He paid $5,000 Haitian Gourdes to be smuggled into Freeport Bahamas. He arrived in Freeport on Saturday (06/17/2023). P.C. stated while in Freeport he was introduced to boat captains (later identified as GARCIA and PEREZ), and he made arrangements to be smuggled into Florida for $6,000 USD. P.C. stated that the agreement was that once they made successful entry into Florida, GARCIA would transport them to his residence where they could communicate with family/friends to obtain the $6,000 USD smuggling fee. P.C. identified GARCIA as the captain of the boat. He identified PEREZ as a co-captain but mainly maintained the vessel's motors.

On July 11, 2023, at approximately 10:19 a.m., SA Medina, SA Rafael A. Moronta, and Deportation Officer (DO) Charles A. Hardin II conducted another interview of P.C. at the Broward Transitional Center. P.C. is only fluent in the Creole language, and DO Hardin is fluent in the Creole language and provided translation. P.C. stated while in Freeport he and his friends' made arrangements with GARCIA and PEREZ to be smuggled into Florida for $6,000 USD. P.C. identified GARCIA and PEREZ via photos as the individuals he made the arrangements with.

On June 22, 2023, an HSI Computer Forensic Agent conducted an examination of GARCIA's cellular telephone. A review of the telephone's files revealed a boating application named NAVIONICS. Navionics is a boating application for mobile devices with the ability to let you plan and save all your activities on the water. The application can be used on your cellular telephone or tablet. A review of saved records reflects an entry on June 18, 2023, Titled Route 068. The route shows a starting point South of the Grand Bahamas (coordinates 26°27.062'N 79°0.921W) traveling westerly ending near Delray Beach, Florida (coordinates: 26°26.837'N 80°2.622'W).

On Friday, September 29, 2023, a material witness deposition was held during which P.C. was questions by the government and lawyers for GARCIA and PEREZ. P.C. testified consistent with the previous interviews, that GARCIA was the boat captain during the smuggling venture and that PEREZ was his assistant who several times helped fix the boat engine during the trip. P.C. identified both defendants during the deposition.

### III.   Analysis

*A. Number of aliens*

The government agrees with the PSR's calculation in paragraph 36 that the offense involved the smuggling of six or more aliens but less than 24 aliens, which results in a

three-level increase in the offense level. PSR ¶ 36. The government submits that it can prove by a preponderance of the evidence that the offenses involved the unlawful smuggling of ten aliens. There were two smuggling events in this case, May 4, 2023 and June 18, 2023. On the May 4 incident, one alien was encountered on the boat, Walter Serrano-Cabrera. Law enforcement also found a backpack left behind and found a Chinese identification card with the name W.Z. HSI later discovered that the person two whom this identification document belonged later filed an asylum application with ICE using the same name and date of birth as on the ID. In that application, W.Z. claimed that he entered without inspection illegally on May 4, 2023 near Miami, which matches this smuggling event. Moreover, surveillance video cameras showed a jet ski dropping of several other individuals from the boat used by the defendants, who fled and were not caught (six are seen on video getting into a van). As such, this event involved seven aliens (six who got away, and one who was caught). On the June 18 incident, there were a total of five people arrested by law enforcement, the two co-defendants and three unlawful aliens. As such, the government submits that, by a preponderance of the evidence, the offense conduct involved the smuggling of ten aliens in total.

### B. Possession of a firearm

The government agrees with the defendant that the firearm enhancement should not apply.

### C. Obstruction of Justice

The PSR applies two separate enhancements for obstruction of justice. The first is under Section 3C1.1 of the Guidelines in paragraph 40 of the PSR. The defendant does

not appear to be objecting to this enhancement.  It applies because the defendant "willfully fail[ed] to appear, as ordered, for a judicial proceeding," that is, the defendant was notified to appear for his bond revocation hearing on February 6, 2024, and failed to appear.  Again, the defendant does not appear to be objecting to this enhancement.

The second enhancement for obstruction of justice in the PSR is under 3C1.2 of the Guidelines in paragraph 41 of the PSR, to which the defendant does object.  Section 3C1.2 states: "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels."  U.S.S.G § 3C1.2.   Paragraph 73 of the PSR describes the arrest report alleging the defendant's actions during his most recent arrest in Fort Myers, Florida.  Assuming for the sake of argument that the defendant's proposed legal standard is the correct one, namely, that there has to be "evidence he fled during the commission of the offense conviction, in preparation for it, or to avoid detection or responsibility for it" (Defense motion page 4), it would seem fair to say that by a preponderance of the evidence, the defendant fled for numerous reasons, including to avoid detection and responsibility for this federal case.  The defendant did not show up for his federal court hearing and then absconded to For Myers, Florida in violation of his bond conditions.  When he was caught by law enforcement for a different offense, he fled.  In other words, his fleeing from police was motivated at least in part "to avoid detection or responsibility for" this federal offense of conviction.   As such, this enhancement should apply.

### D. Acceptance of responsibility

The government opposes acceptance of responsibility for numerous reasons. Section 3E1.1 states: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." The burden of demonstrating acceptance of responsibility is on the defendant. *United States v. Moriarty*, 429 F.3d 1012, 1022-23 (11th Cir. 2005). "Although a guilty plea can constitute significant evidence of acceptance of responsibility, it may be outweighed by conduct of the defendant inconsistent with an acceptance of responsibility." *Id.* The Guidelines state that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, comment (n.4). A defendant who receives an enhancement for obstruction of justice is entitled to an adjustment for acceptance of responsibility in only exceptional cases. *Id.; United States v. Amedeo*, 370 F.3d 1305, 1321 (11th Cir.2004). "The guidelines explicitly contemplate that conduct resulting in an obstruction-of-justice enhancement may warrant a denial of an acceptance-of-responsibility reduction. U.S.S.G. § 3E1.1 cmt. n. 4. *United States v. Balbuena*, 343 F. App'x 510, 517 (11th Cir. 2009) (Thus, it was permissible for the district court to consider Balbuena's failure to appear for his plea hearing in both guidelines calculations.) In *United States v. Gonzalez*, 216 F. App'x 955, 956 (11th Cir. 2007) (unreported), the Eleventh Circuit upheld the District Court's application of both an enhancement for obstruction of justice and a reduction for acceptance of responsibility where the defendant initially took responsibility for his role in

the cocaine conspiracy by pleading guilty, but he did not appear at his sentencing hearing for that conviction and remained a fugitive for almost eight years.

In this case, the defendant submitted five positive drug screens while on bond and then did not appear at his federal bond revocation hearing. Instead, he absconded to another district, and was arrested on another case (his second arrest while on bond). As such, he should not receive acceptance of responsibility. The defendant argues that the Court is not allowed to consider the Application Notes to Section 3E1.1. The government disagrees. However, even if the Court did not refer to the application notes here, absent the application note, Section 3E1.1 still states: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." The defendant has not clearly accepted responsibility because he fled from his court hearings in the case precisely to avoid responsibility.

The defendant argues that "if the Commission intended the Court consider something more than Mr. Garcia's written [DE 49] and verbal [DE 51] acceptance of responsibility for his offense, it would have said so." The defendant undermines his own argument, because using written and verbal statements to accept responsibility are likewise not mentioned in Section 3E1.1 other than in Application Note 1(A). In other words, the defendant wants the Court to consider Application Note 1(A) (the defendant truthfully admitting conduct), but not Application Note 4 (obstruction of justice ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.). In any event, Application Notes or not, the defendant has not clearly accepted responsibility. At the very

least, he fled from his court hearings in this case specifically to avoid responsibility for this crime.

## IV.   Conclusion

For the foregoing reasons, the Court should overrule the defendant's objections to the PSR, except for the firearm enhancement, which the government agrees should not apply.

                                Respectfully submitted,

                                MARKENZY LAPOINTE
                                UNITED STATES ATTORNEY

By:   */s/ Marton Gyires*
       MARTON GYIRES
       Assistant United States Attorney
       Court ID No. A5501696
       500 South Australian Avenue, Suite 400
       West Palm Beach, FL 33401
       Tel: 561-209-1047
       Marton.Gyires@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Court and delivered to counsel of record using CM/ECF.

*/s/ Marton Gyires*
MARTON GYIRES
Assistant United States Attorney
